CONNELL v. SOUTHERN RY. CO.[1]

(Circuit Court of Appeals, Fifth Circuit. January 10, 1899.)

No. 742.

**1. RAILROADS—INJURY TO PERSON ON TRACK—TRESPASSERS.**

Defendant railroad company entered into a contract with a second company for the exclusive use of certain terminal tracks of the latter on which to run trains to and from exposition grounds, the two companies, however, sharing in the expenses and earnings of such trains. Such tracks ran through the yards of the second company, in which was situated its yard office, in close proximity to one of the tracks so used by defendant. 'Held, that a person in the yards and at such building on business with the second company, and rightfully there as to such company, was not a trespasser as to defendant.

**2. SAME—SPEED OF TRAINS—NEGLIGENCE.**

It is the duty of a railroad company to exercise due care in the running of its trains at all places where it had knowledge that there are likely to be persons on or near its tracks, to avoid injury to such persons, whether or not the place is a public crossing. In an action for the death of a person struck and killed by defendant's train in the evening in front of the yard office of another road, the doors of which opened on the side next to the track used by defendant, which was about seven feet from the building, it being shown that numerous persons, chiefly employés of the other road, frequented the building, passing in and out of the doors at all hours, the question of the speed of the train, and the manner of its operation, the lighting of the place, the existence of guards, and the other surroundings of the place, are all matters for the jury, as bearing on the question of defendant's negligence in operating the train.[2]

In Error to the Circuit Court of the United States for the Northern District of Georgia.

This was an action by Nannie E. Connell against the Southern Railway Company to recover damages for the death of her husband, alleged to have been caused by the defendant's negligence in the operation of one of its trains. Under instruction of the court, a verdict was returned for defendant, and plaintiff brings error.

J. T. Pendleton and J. L. Hopkins, for plaintiff in error.

R. T. Dorsey, P. H. Brewster, and Saunders McDaniel, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

McCORMICK, Circuit Judge. The Southern Railway Company and the Georgia Railroad Company entered into the following contract:

"This agreement and contract, made and entered into on this 22d day of July, 1895, by and between the Southern Railway Company, party of the first part, and the Georgia Railroad Company, party of the second part, both having terminal facilities at Atlanta, Georgia, witnesseth: That whereas, the people of Georgia are contemplating the making and presentation of a Cotton States and International Exposition, to begin at Atlanta, Georgia, on the 18th day of September, 1895, and to continue for ninety days or more, which is expected to draw a large number of visitors to attend the

---

[1] Rehearing denied February 21, 1899.

[2] For liability of carriers for negligence of their servants, see note to Railway Co. v. Williams, 10 C. C. A. 466.

same; and whereas, on account of the situation of the premises at which the said exposition will be held, the burden is cast upon the said Southern Railway Company to deliver and return visitors who may attend the same by railway; and whereas, the preparation necessary to inaugurate and continue such service will involve heavy outlays and expenses; and whereas, the said Georgia Railroad Company, for the purpose of aiding this public concern, and joining in the general desire for the successful operation of said exposition, has offered, on a liberal and equitable basis, to contribute the use of certain of its tracks at its terminal at the passenger depot in Atlanta, Georgia, for said purpose, and during the continuance of said exposition, and until a reasonable time shall have elapsed for a return of the same for its own proper use: In consideration of all which it is agreed: (1) That the Georgia Railroad Company offers to the said Southern Railway Company the use of certain of its tracks contiguous to its said depot, as is shown by a plat hereto attached and made a part of this agreement, during the period aforesaid. (2) The said Georgia Railroad Company offers to join the Southern Railway Company in the whole enterprise by sharing the earnings that shall have been made by the Southern Railway Company in said transportation, and all operating expenses incurred by the same, except the costs of accidents of whatsoever nature, on mileage basis of tracks provided by each for said purpose: it being understood that the cost of making all the change in tracks and switches, and the cost of all platforms, passenger sheds, etc., to be constructed on property of the Georgia Railroad Company, shall be borne solely by the Southern Railway Company, and the Georgia Railroad Company will not enter upon the tracks referred to with its engines or cars. (3) The mileage is to be the actual mileage of a double-track railroad from Loyd street, Atlanta, to the terminus at the grounds of the Exposition Company, as used by said trains, and the mileage of the Georgia Railroad from Loyd to the point where the tracks of the Southern Railway will connect with the tracks of the Georgia Railroad, and the Southern Railway mileage from that point to the terminus. (4) The rates and expenses are to be entirely under the control of the Southern Railway Company, of which due report is to be made to the Georgia Railroad Company. (5) The tracks of the Georgia Railroad Company at and near the passenger depot in Atlanta, which, under this agreement, will be changed from their present condition, as shown by said plat hereto attached and made a part hereof, shall be restored promptly after the exposition. (6) Inasmuch as the operation under this agreement will bar the said Georgia Railroad Company from access to the Atlanta & West Point Warehouse and tracks thereof, it is agreed by the Southern Railway Company that it will switch the freight cars of the said Georgia Railroad Company to and from the same, free of charge, during the term of this agreement. (7) The Southern Railway Company will build, at its own expense, a siding on the front side of the Atlanta & West Point Warehouse, provided the owner of the warehouse permits the same, free of cost. (8) If the Georgia Railroad Company has the right, by decision of arbitrators, to use the Bell Street Compress freely with the Southern Railway Company, the Southern Railway Company will provide suitable arrangements for the Georgia Railroad to switch the cars at night to and from the compress at such times as exposition trains are not in service. This contract to be effective only by ten days' written notice from the third vice president of the Southern Railway Company to the general manager of the Georgia Railroad Company. In testimony of all which said parties, by their proper officers, having previously been thereunto authorized, have hereto set their names in duplicate, on the day and date above written."

At the date of the making of the contract just recited there was in force in the city of Atlanta an ordinance to the effect that:

"No railroad engine, with or without cars attached to the same, shall be run through any part of the city of Atlanta at a greater rate of speed than six miles per hour. Any engineer or other person in charge of an engine who shall violate the above section, may be arrested by any officer or member of the police force, and taken before the recorder's court, and may on

conviction be fined in a sum not exceeding five hundred dollars, or be imprisoned not exceeding thirty days, either or both, in the discretion of the court."

On Sepember 16, 1895, this ordinance was amended by adding thereto the following:

"Provided this ordinance shall not apply to trains of the Southern Railway Company transporting passengers to and from the Cotton States and International Exposition, if said company before running such trains faster than six miles an hour shall enter into an obligation with the mayor of the city of Atlanta to hold the city of Atlanta harmless on account of any damage which may result to persons or property on account of injury inflicted by the rapid running of the trains of said company over any of the street crossings at a greater rate of speed than six miles an hour, and to reimburse the city of Atlanta in any damages it may have to pay on account of injuries so occasioned."

On the same day (September 16, 1895) the third vice president of the Southern Railway Company, purporting to act for it, entered into bond in the sum of $50,000, payable to the mayor of the city of Atlanta and his successors in office, conditioned as follows:

"The condition of the above obligation is such that if the said Southern Railway Company, or its successors, shall hold the city of Atlanta harmless on account of any damage which may result to persons or property on account of injuries inflicted by the rapid running of the trains of said company over any of the street crossings of said city at a greater rate of speed than six miles an hour, and shall reimburse the said city for any damage or expense of litigation or otherwise which it may have to pay on account of injuries so occasioned in the running of the trains of said Southern Railway Company to and from the Cotton States and International Exposition grounds, during the months of September, October, November, and December, 1895, then the above obligation shall be void and of none effect; otherwise it shall remain in full force and virtue."

Some changes and additions to the tracks having been made, and the equipment for running the exposition trains provided, the trains began to run on the opening of the exposition, September 18, 1895. From the Atlanta terminal at Loyd street an inclosure was constructed, extending in the direction of the exposition grounds down into the yard of the Georgia Railroad, about 375 feet. Near the Loyd street terminal, but exactly how near the proof does not show, there was constructed a cross-over switch to connect the two tracks that were to be used and were used by the exposition trains. About 300 yards east—that is, in the direction of the exposition grounds—of this cross-over switch was situated a building which is called the "Yard Office" of the Georgia Railroad. This building was north of, and fronted towards, the tracks which were used by the exposition trains, and extended along them (not exactly parallel, for there was a slight curvature in the track) to the length probably of 35 or 40 feet. The track on which the exposition trains returned to Atlanta was situated nearest to this building. At the east end—the end nearest the exposition grounds—the nearest track was about $6\frac{1}{2}$ feet from the face of the building, and at the west end it was a few inches over 7 feet. In this building, and facing these tracks and five or more others in the yard, there were two doors, one entering a room which is called the "East Room," and the other entering a room which is called the "West Room," the distance between these doors from center to center being 24 feet. The west room

was a double room, or had a small room cut off from it on the east, with a communicating door between this small room and the west room, but with no communication between it and the east room. In this middle room there was a window facing the tracks. From each door there extended a platform 4 feet wide, on a level with the ground, and reaching out to the north rail of the nearest track. Immediately in front of the door of the west room was placed a railing running along the track, at a distance from the door that would enable two persons to pass each other between the railing and the house. The west end of this railing and the wall of the house were connected by a cross railing, to prevent ingress and egress from or towards the west. Exactly how far the railing in front of the west door extended east of the platform the proof does not show, but not far enough to reach the platform in front of the east door. The west room, including the communicating room, was the yard master's office, and was furnished with telephone connection and other necessary appointments. The east room was furnished with benches, and used as a waiting room for the yard hands and other employés whose business called them to the yard master's office. Immediately west of the platform that was in front of the east door, and set in the corner which this platform made with the yard-office building, was a telephone post 11 inches in diameter, so planted that there were 9 inches between it and the face of the building.

On November 6, 1895, J. T. Connell shipped from Camak, Ga., by the Georgia Railroad, two cars of cattle, which he wished to have go to Vicksburg, Miss. They were to be forwarded from Atlanta by a road then operated by the Southern Railway Company. A servant, Isaac Brinkley, accompanied the two cars of cattle on the freight train, which arrived at Atlanta about 8 o'clock in the evening of that day. At Camak, Mr. Connell himself took the passenger train at about half past 1 o'clock, and arrived at Atlanta ahead of the train which brought his cars of cattle. About 7 o'clock he went to the freight office to see the freight agent of the Georgia Railroad Company, and presented to him (G. R. Pace) the contract he had for two cars of cattle going to Vicksburg, Miss. He said he wanted them transferred to the Southern road. The agent had no billing at the time, and therefore went to the telegraph key, and called up the agent at Camak, the junction of the main line with the Macon branch, and got from him the numbers and initials of the two cars, and the time the cattle were watered, fed, and loaded. He then telephoned the yard office of the Southern road, and told them that these cars would be there inside of two hours that night. He also telephoned the agent's office of the Southern Railway, at Peters street, and told them—those in charge of the agent's office at Peters street—that the cattle would be there, but that the billing would not reach them until the next morning. He then notified by telephone the Georgia Railroad's yard office, hereinbefore described, and gave them instructions to have the two cars delivered to the Southern Railway. Mr. Connell remained a little time in the freight agent's office, read a letter from his family, chatted pleasantly with persons in the office, and seemed to the agent to be "a very chummy fellow in every way." He then asked how far it was to the Peters

470 91 FEDERAL REPORTER.

street office of the Southern Railway, and was told that it was about three-quarters of a mile. He said he did not believe he wanted to walk that far, but would go down and ride around the belt with the stock. After this (at about 10 o'clock, the witness thinks, but from the other testimony we judge it was earlier) Mr. Connell came to the gate of the inclosure at the Loyd street terminal, above mentioned, and manifested a wish to go through, when the guard, G. R. Gilbert, told him that he could not go through. Mr. Connell answered that he would like to go through, but if there was a rule against it he would abide by it. The witness told him no one was allowed to go through there; that it was dangerous; and that his (the guard's) duty was to prevent any one from going in. Mr. Connell said that he had some stock he wanted to see about, and that he would go around there some way, and went off. He was very pleasant in regard to it. Mr. Connell reached the yard office, by what route the proof does not show. When he got there he found his servant man, Brinkley, in the waiting room (east room), and got from him a paper he had. He then gave his overcoat and satchel to the servant, and went out towards the west room. At the door of this room he met T. C. Christian, the yard foreman, or foreman of the engine, who at night acted as yard master, and who was starting out to his engine. Connell asked Christian about the cars of stock, saying that he had two cars, and wanted to get them transferred to the Southern Railway. At the same time he presented a bill of lading, which Christian took, and turned back into the office; leaving Connell standing at the outside of the door, at the railing. Christian handed the bill of lading to Langston, an employé in the office, and asked him if it was all right for the stock to go forward, who said it was, and turned to the telephone, Christian remaining standing near the telephone. In a few minutes—not more than two or three, and before Langston could get the connection with his telephone—the incoming exposition train passed, and Mr. Connell received injuries which in a few days resulted in his death. Isaac Brinkley says that Mr. Connell came back to the east room after he had been to the west room with his papers, and directed him (the witness) to get his (Connell's) satchel and overcoat, and then walked out, starting to go to the door of the other room, where the men were. This witness says further: "He was struck immediately upon leaving the room I was in. When I got his satchel and overcoat, and got to the door of the room I was in, I heard him cry out."

Mr. Connell had a wife and four children. His surviving widow, suing for herself and for her four minor children, brought this action against the Southern Railway Company, March 5, 1896, claiming damages for the death of her husband, averring that it was occasioned by the negligence of the defendant company. She alleged that the yard office was a place where the public transacted business with the Georgia Railroad & Banking Company relative to the shipment or transfer from that road to another of loaded cars; that it was the only place where the public could transact with promptness such business, and was the place where the public were and are invited for that purpose, and was a place where a person with such business had a legal right to go; that the defendant company was negligent in placing its track too close to the house and telephone post; that prior to the exposition, and

now, the track (its nearest rail) was and is nine feet south of the yard office; that, to make its connections, the defendant company moved the track nearer to the house, so as to leave only about two and one-half to three feet between the telephone pole and the rail of the track, whereby it was made dangerous for the public to go to the house, or to pass from one room thereof to the other, by reason of the trains passing on the track; that there were no lights placed there to warn people of the danger while transacting business at the yard office, nor were there any railings placed between the house and the track to protect or warn persons of the danger from passing trains; that the train which struck her husband was running at the rate of 25 miles an hour; that the engine was going into the city backwards, with the tender in front, and the light placed so far back on the tender as to be practically useless in advising people of the approach of the engine, and to enable the engineer to see persons near to the track.

The answer of the defendant, besides the admissions and denials of matters as pleaded in the numbered paragraphs of the declaration, for affirmative defensive plea set up that Connell, before he went to the place where he was struck by the defendant's engine, was warned that there were many tracks and many passing trains at the place where he was struck, and that his death was the result of his own negligence and lack of care.

There was proof to show that the defendant company had moved the track so that the rails were placed somewhat nearer to the yard office than they had been before. There were no warning lights placed outside of the yard office. There was no protecting railing, except immediately in front of the door to the west room, which, immediately west of that door, was connected with the house. The incoming passenger train which struck the deceased was pulled by an engine that was running backward, with the tender in front. There was some conflict in the evidence as to the character and position of the light that was on the tender. The testimony was conflicting as to the rate of speed at which the train was running at the time the deceased was struck. The estimate of some of the witnesses was 13 miles an hour. Others gave it at 25 miles an hour. There was no direct testimony as to exactly where, with reference to the rail of the track, deceased was at the instant he was struck. The engineer, the fireman, and the conductor had all seen him just before he was struck, but each thought he was in a position where he could have and had stepped out of the way of the train, until they saw that he was hit. The conductor thought he was not knocked down by the engine, but had tripped against the north rail of the track, or against the railing that was in front of the west door, and went down so that his feet were struck by the car and crushed. Besides the proof in reference to his dealings that evening with the employés in the yard office, there was other testimony tending to show that it was not unusual for shippers of stock to visit the yard office to expedite the transfer of their cars from the Georgia Railroad to connecting lines. The proof tended to show that such was the custom in the yard office of the defendant railway company. The proof also showed that there were at all times a number

of persons (railroad employés) standing around and passing about this yard-office building.

In this state of the proof the circuit court charged the jury as follows:

"I will state that in this case the court is of opinion that the plaintiff is not entitled to recover, under any view of the evidence submitted as to the proximity of this yard master's office to the track of the defendant company. As to the deceased being invited to come there and transact his business, or being permitted to come there and transact his business, if this was a nuisance, or a dangerous place for which there was liability, in the opinion of the court it was on the part of those who invited him there, and permitted him to come there, and not on the part of this defendant company. As to the speed of the train, a question might arise,—a serious question,—if this accident had occurred at a crossing,—a public street crossing,—instead of happening where it did. Happening where it did, I don't think the speed of the train cuts any figure in the case at all. In other words, the court is of opinion, relieving it of all outside matter, that the deceased was on the track, or so near the track, of the defendant company, that he was in danger of being hurt, at a place where he had no right to be, as against this company; and the only right he could have, as against this company, would be in the event they could have saved his life after they discovered his peril. Counsel for the plaintiff have declined to put their case on that ground, because they do not believe that is the truth about it, and do not believe that they saw him in time to save his life. Therefore the case stands upon the other ground; and, although reluctant, I feel it my duty to instruct you to return a verdict in favor of the defendant."

—To which charge as a whole, and to three specified parts of it, plaintiff then excepted, and presented numerous requests to charge, which the court refused.

We think the court erred in the charge given. We do not further notice the charges requested and refused, because the views we have with reference to the charge given will avoid the necessity for like requested charges on a new trial. We do not discuss the first ground stated in the court's charge in support of the instructions to the jury to find a verdict for the defendant, because it appears to us, from the nature of the whole proof, that the matters it involves are substantially immaterial in this case. We think the second ground on which the court based its instructions to the jury is clearly erroneous. The relations between the defendant railway company and the Georgia Railroad Company were such that, if the deceased was not a trespasser in the yard office, or on the grounds of the railroad company, he was not a trespasser as to the defendant railway company. And, whether he was or was not a trespasser, the fact that he was at a place where numerous persons were constantly passing in and out of the east and west rooms, and standing about the doors, or passing from one to the other,—even though they were all employés in the yard office,—imposed upon the defendant railway company, in running its cars past that place, the duty to use such a rate of speed as would not endanger the lives of these employés; and, in that state of the case, Connell could reasonably rely on the defendant's discharging this duty. The rate of speed of the train in passing that point was therefore a material consideration, to be submitted to the jury in ascertaining the truth of the plaintiff's averment of negligence on the part of the defendant railway

company.    Crossings of roads and streets receive particular mention in the adjudged cases, because carriers are charged with notice that at such places persons are liable to be exposed to danger from passing trains.    The ordinance of a city may sometimes fix the rate of speed at street crossings.    In a city such crossings are usually numerous, and so near together that, if the rate of speed is limited to six miles an hour (the usual limit) at the crossings, it practically brings the train to that rate between crossings.    The ordinance in Atlanta applies to all places within the city limits, except so far as modified in favor of the defendant company.    A railroad company is required to regulate the rate of speed of its trains with regard to the existence of the fact that there is or is not, in certain localities, danger to persons or property incident to that mode of movement.    In the absence of any ordinance, it would be negligence in such a company to rush its trains through the streets of a populous city at a dangerously high rate of speed. When there is such an ordinance, the rate named therein is taken by the courts to be, prima facie, a safe and careful rate, and the use of a higher rate than that named in the ordinance is prima facie negligence. The city of Atlanta did not, if it could, license the defendant railway company to use a highly dangerous rate of speed in running the exposition trains.    The amendment to the ordinance withdrawing its application to these trains did no more, if it could do so much, than repeal the ordinance as to these trains.    Whether the defendant railway company could or could not be charged with negligence on account of the original constructing of the yard master's office building so near to the track, or on account of moving the tracks nearer to the same than they were as originally constructed, or on account of using the tracks after they were so moved, and running its exposition trains thereon, without placing protecting railings and warning lights to guard against danger at that point, it was competent for the plaintiff to show the conditions of things there, and the knowledge on the part of the defendant's employés, or their opportunities to know, of the exact state of those conditions.    And it was incumbent on the court to submit to the jury this proof, and the proof in reference to the manner of running the train, its rate of speed, and all of the particulars bearing immediately on the happening of the fatal injury.

Without expressing any view as to the other questions raised on the trial, we conclude that, because of the error of the circuit court in holding that, happening where the accident did, the speed of the train at the time deserves no consideration, we are of opinion that the judgment should be reversed.    And it is therefore ordered that the judgment of the circuit court be reversed, and this cause is remanded to that court, with directions to award the plaintiff a new trial.